1  LEE TRAN & LIANG APLC
     James M. Lee (Bar No. 192301)
2    Enoch H. Liang (Bar No. 212324)
   601 S. Figueroa Street, Suite 4025
3  Los Angeles, CA 90017
   Tel: (213) 612-3737
4  Fax: (213) 612-3773
   Email: jml@ltlcounsel.com, ehl@ltlcounsel.com

5

6  Attorneys for Plaintiff
   Actuate Corporation
7

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12

13

14                                    CV. 10    2797

15  ACTUATE CORPORATION, a          ) CASE NO.:
    California corporation,          )
16                                   ) COMPLAINT FOR:
                 Plaintiff,          )
17                                   ) 1. COPYRIGHT INFRINGEMENT
          v.                         ) 2. BREACH OF CONTRACT
18                                   )
19  FINITI LLC; and DOES 1 through 10, )
                                      )
20               Defendants.          ) DEMAND FOR A JURY TRIAL

21

22

23

24

25

26

27

28

                                              COMPLAINT

Plaintiff Actuate Corporation complains of Defendants and alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises under the copyright laws of the United States, Title 17, *United States Code* and for a related breach of contract action.  The jurisdiction of this Court is founded upon 28 U.S.C. § 1331, 17 U.S.C. § 502, and 28 U.S.C. § 1367.

2.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim and the actual harm to Plaintiff occurred in this District by reason of the Defendants' conduct as alleged below.  Venue is proper in any judicial district in which any defendant would be amenable to personal jurisdiction.  Defendants are subject to the personal jurisdiction in this District as a result of the following: (i) a venue provision in the contract at issue in this matter; (ii) Defendants' intentional and willful continued infringement of the copyrighted material owned by Plaintiff; (iii) Defendants' knowledge that Plaintiff resided in and had its principal place of business in this District; (iv) Defendants' knowledge that the injury would be likely to be suffered in this District; and (v) Defendants' otherwise making available the infringing materials for distribution in the Internet within this District.

## PARTIES

3.     Actuate is a corporation incorporated in the state of Delaware with its headquarters at 2207 Bridgepointe Parkway, Suite 500, San Mateo, California.

4.     Actuate is informed and believes, and on that basis alleges, that defendant Finiti LLC is a Delaware limited liability company with its headquarters

-2-

1  at 7090 Samuel Morse Drive, Columbia, Maryland and registered with the

2  California Secretary of State to conduct business in this state as a foreign LLC.

3      5.    The identities of the fictitiously named defendants are not currently

4  known, and this complaint will be amended to include the names of such

5  individuals or entities, when the same is known.

6      6.    Plaintiff is informed and believes, and on that basis alleges, that at all

7  relevant times mentioned in this complaint, Defendants, and each of them, were

8  acting in concert and active participation with each other in committing the

9  wrongful acts alleged herein, and were the agents of each other and were acting

10  within the scope and authority of that agency and with the knowledge, consent and

11  approval of each other.

12      7.    Plaintiff has no plain, speedy, or adequate remedy at law, and stands

13  to suffer irreparable harm.  For that reason, Plaintiff seeks injunctive relief.

14

15                      **FACTS GIVING RISE TO THIS ACTION**

16

17      5.    Actuate develops computer software and sells licenses to that

18  software, almost exclusively to large businesses.

19      6.    Actuate holds all right, title, and interest in federally-registered

20  United States copyrights covering its Actuate 10.0 software and earlier versions

21  thereof, including the following copyrights: TX0006348889; TX0006348888;

22  TX0006348887; TX0006348886; TX0006348885; TX0006348884;

23  TX0006348883; TX0006348882; TX0006348881; TX0006348880;

24  TX0006348879; TX0006348878; TX0006348877; TX0006348876;

25  TX0006348875; TX0006348874; TX0006348873; TX0006348872;

26  TX0006348871; TX0006348870; TX0006862866; TX0006862880;

27

28

1  TX0006862885; TX0006863869; TX0007098707; and TX0007097438

2  (collectively, the "Copyrighted Work").

3      7.     Defendant Finiti LLC—as a subsidiary of First American

4  Corporation—is a joint venturer and/or partner of Citibank Global Markets, Inc.

5  fka Solomon Smith Barney, Inc. (Citibank Global Markets, Inc. is herein referred

6  as "Citibank").  Finiti is also believed to have been known as Chesapeake

7  Management Company LLC.

8      8.     On March 31, 1999, Actuate and Citibank entered into a Master

9  Perpetual License Agreement ("Master Agreement") that governs the terms and

10  conditions of the user of Actuate's software.  Attached as Exhibit "A" is a true

11  and correct copy of the Master Perpetual License Agreement, the terms of which

12  are incorporated as though fully set forth herein.

13     9.     As provided in Section 5.3, the Master Agreement enabled Citibank

14  to grant other affiliated entities including its joint ventures or partnerships a

15  license to use Actuate's software under its prescribed terms and conditions.

16     10.    On December 29, 2004, Actuate and Citibank amended the terms of

17  the Master Agreement ("Master Agreement Amendment").  Attached as Exhibit

18  "B" is a true and correct redacted copy of the Master Agreement Amendment, the

19  terms of which are incorporated as though fully set forth herein.

20     11.    The Master Agreement and the Master Agreement Amendment is

21  referred herein as "License Agreement".

22     12.    On or about April 2006, Finiti approached Actuate and sought to

23  expand the license terms and began negotiating for individual pricing under the

24  License Agreement.   Finiti, like all of Citibank's affiliates, was able to benefit

25  from and also bound by the terms in the License Agreement.

26     13.    Actuate offers an unlimited user option which enables its customers

27  to freely distribute content generated by its software.  However, Finiti elected the

28

-4-

1   less expensive option of a per user license fee option.   Finiti elected the iServer

2   base system with a 400 user license and UAT, Train, Dev, SIT options for 50 user

3   licenses each (collectively, the "Licensed Software").

4        14.   Actuate calls this option the "Named User" license option.  The

5   named user option limited Finiti to distribute content to only the specified number

6   of "Named Users".

7        15.   The definition of a "Named User" is set forth in the Master

8   Agreement Amendment which defines "Named User" as follows at Paragraph 5:

9        With respect to any Product licensed by Licensee which is

10        designated as a "Named User License", and thereby limited to a

11        specified number of named individual users, the following shall

12        apply, and Licensee agrees to use such Product only in accordance

13        with the following restrictions: A Named User means and includes

14        any Personnel (as that term is defined below) of Licensee, including

15        any customer of Licensee, who receives reports managed or

16        generated by the iServer Product. Named Users are authorized by

17        Licensee to access the iServer Product to view such reports. Reports

18        may be received by email or by hardcopy. A Named User license

19        allows only a specific number of Named Users, as set forth above, to

20        access the iServer Product or view reports generated by the iServer

21        Product. No other users are licensed to access the iServer Product or

22        view reports generated by the iServer Product at any time. Personnel

23        means and includes Licensee's directors, officers, employees, agents,

24        auditors, consultants, and subcontractors.

25

26

27

28

COMPLAINT

16.     Finiti purchased and installed the Licensed Software on its computer systems shortly on or after April 20, 2006.  Attached as Exhibit "C" is the April 2006 Quote and Purchase Order executed by Finiti.

17.     Finiti then purchased and installed an additional 50 user purchase for testing and development in December 2006.  As of December 2006, Finiti continued to have a 400 Named User license and 100 user license for testing and development.

18.     However, on or about October 2008, Actuate discovered that Finiti was breaching the terms of the License Agreement by distributing Actuate generated content to beyond the 400 Named Users.

19.     Actuate discovered that Finiti had been distributing the software generated content to over 2,000 users of various capacities including to other vendors/providers, to other Citibank business channels (including its 2,100 branches across the country), and to various Finiti employees.

20.     Despite Actuate sending a notice of material breach to Finiti on March 23, 2009, it is believed that Defendant continues to use the Licensed Software.  By the terms of the License Agreement and the notice dated March 23, 2009, the license to Finiti expired thirty days from the date of notice, or on April 22, 2009.

21.     As of the date of this Complaint, Defendant had not confirmed that Defendant had ceased using the Licensed Software.

22.     Upon information and belief, Defendant continues to use the Licensed Software without a license, thereby willfully infringing Actuate's copyrights.

-6-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CLAIM FOR RELIEF**

**(COPYRIGHT INFRINGEMENT)**

**Against All Defendants**

23.     Actuate repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 22 above as though fully set forth herein.

24.     Defendant has reproduced, displayed, and distributed unauthorized copies from Actuate's Copyrighted Work.  Such unauthorized copies and use exceed the permissible license terms and therefore constitute unlawful reproductions of Actuate's Copyrighted Work.

25.     Defendant's acts violate the exclusive rights of Actuate as the copyright holder to reproduce, display and distribute the Copyrighted Work and to create derivative works from it, as set forth in 17 U.S.C. § 106.  Defendant's use of these Copyrighted Work is and has been made without Actuate's consent.

26.     Defendant's actions described above have caused and will continue to cause irreparable damage to Actuate, for which Actuate has no remedy at law. Unless Defendant is restrained by this Court from continuing their infringement of the Copyrighted Work in violation of 17 U.S.C. § 106, these injuries will continue to occur in the future.

**SECOND CLAIM FOR RELIEF**

**(BREACH OF CONTRACT)**

**Against All Defendants**

27.     Actuate realleges and incorporates by reference paragraphs 1 though 26 above as though fully set forth herein.

28.     The License Agreement constitutes writings to which Defendant was a party and through which Actuate provided Defendant with a limited license to use the Licensed Software.

29.     Actuate fulfilled all of its obligations under the License Agreement that were not excused by Defendant's actions.

30.     One of the limitations contained in the License Agreement is that Defendant could not exceed the number of Named Users beyond that which was licensed to them.

31.     Actuate is informed and believes that Defendant breached the License Agreement by exceeding the permissible number of 400 Named Users to over 2,000 users.

32.     Actuate has been harmed by Defendant's ongoing breach of the License Agreement and is entitled to both injunctive relief and monetary damages in an amount to be determined at trial, but in excess of the jurisdictional requirements of this Court.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment in its favor against each of Defendants as follows:

1.     An injunction barring Defendant from continuing to possess or use the Actuate Software and enter preliminary and permanent injunctions requiring Defendants, and all those acting in concert or participation with them, from infringing or encouraging, aiding or abetting others to infringe the Copyrighted Work;

2.     Actual damages and disgorgement of Defendant's profits from its infringement of Actuate's copyrights;

1    3.    Costs of suit and attorneys' fees, pursuant to 17 U.S.C. § 505;

2    4.    And that Plaintiff be granted such other and further relief as the

3  equities of the case may require and as this Court may deem just and proper under

4  the circumstances.

5

6  DATED:  June 25, 2010

7

8                                        LEE TRAN & LIANG APLC

9

10  By_____

11       James M. Lee
         Attorneys for Plaintiff
12       Actuate Corporation

13

14                          **DEMAND FOR JURY TRIAL**

15

16

17       Plaintiff hereby demands a jury trial.

18

19  DATED:  June 25, 2010

20

21                                        LEE TRAN & LIANG APLC

22

23  By_____

24       James M. Lee
         Attorneys for Plaintiff
25       Actuate Corporation

26

27

28

-9-

# EXHIBIT  A

Received: 28.Aug.00 03:48 PM   From: UnknownSender   To: 2403843093

Get faxes by email. Free. eFax.com

Page: 1 of 23

Aug 28 00 03:48p4:10-cv-02797-LB   Document1   Filed06/25/10   Page11 of 39

p.1

MAR 31 '99   05:33PM ACQUISITIONS

P.1/24

## MASTER PERPETUAL LICENSE AGREEMENT

Licensor:   Actuate Software
            999 Baker Way, Suite 200
            San Mateo, CA 94404

Effective Date:

Agreement Number:   AAY98L-000

This Master Perpetual License Agreement ("Agreement") is made and entered into as of the Effective Date above between Salomon Smith Barney Inc., a New York corporation, having an office at 388 Greenwich Street, New York, New York 10013 (hereinafter referred to as "SSBI") and the Licensor specified above.

## ARTICLE 1:  PROVISION OF PROGRAMS

1.1    Under the provisions of this Agreement, Licensor agrees to grant SSBI licenses to use Licensor's proprietary computer programs and associated materials ("Products") which are listed on Schedules substantially in the form of attached Exhibit A ("Schedule").

> 1.1.1 This Agreement also permits SSBI to test and evaluate Products not yet commercially available ("Beta Test") and to test and evaluate commercially available Products for a limited period of time at no charge ("Trial License").   The provisions applicable to Beta Tests and Trial Licenses are set forth in Article 6.

1.2    Each Schedule shall be numbered and dated to facilitate identification and when executed by both parties shall form a part of this Agreement.   Each Schedule shall include: (i) the SSBI site where each Product is to be installed, if applicable, ("Installation Site"); (ii) the name and/or other description of each Product; (iii) the date each Product is to arrive at the Installation Site ("Scheduled Delivery Date"); (iv) the scope of each Product license as defined in Article 5; (v) number of authorized users, if applicable; (vi) number of copies, if applicable; (vii) the description of the functional, operational and design characteristics applicable to each Product at the time the Product is installed or at a mutually agreed to time ("Specifications"); (viii) SSBI's charge for the license for each Product ("License Fee"); (ix) the maintenance charges for each Product, if any ("Maintenance Fee") and whether such Maintenance Fees are monthly, quarterly, annual or otherwise; (x) duration of the Warranty Period, as defined in Section 9.3; (xi) the percentage of discount for the product (Discount Percentage as defined in Section 8.3); and (xii) any other provision the parties mutually agree upon.

> 1.2.1 In the event of any inconsistency between this Agreement and any Schedule, the provisions of such Schedule shall govern for purposes of such Schedule.

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093     Get faxes by email. Free. @Fax.com     Page: 2 of 23

Aug 28 00 03:11p                                                                                    p.2

       MAR 31 '99  05:33PM ACQUISITIONS                                                    P.2/24

Case4:10-cv-02797-LB  Document1   Filed06/25/10  Page12 of 39

1.3    SSBI, its parent company, its and their subsidiaries and affiliated companies ("SSBI Entities") may execute Schedules with Licensor under this Agreement and for purposes of such Schedule shall be considered "SSBI" as that term is used throughout this Agreement.

## ARTICLE 2:  DELIVERY INSTALLATION

2.1    Licensor shall deliver each Product to the Installation Site on or before its Scheduled Delivery Date.  If any Product is not delivered within ten (10) days of its Scheduled Delivery Date, SSBI may, on written notice any time thereafter, terminate the Schedule involved in whole or in part, without obligation, liability or penalty of any kind.

2.2    If "Licensor Installed" is specified on the applicable Schedule then Licensor shall install each Product at the Installation Site as soon as possible after delivery.  If any Product is not installed within twenty (20) days of its Scheduled Delivery Date, SSBI may, on written notice any time thereafter, terminate the Schedule involved in whole or in part, without obligation, liability or penalty of any kind.  Unless an installation charge is specified on the applicable Schedule, there shall be no charge to SSBI for Licensor's installation services.

   2.2.1  If "SSBI Installed" is specified on the applicable Schedule then SSBI shall install the Product in accordance with instructions provided by Licensor and that Product shall be deemed to be installed within ten (10) days after its delivery to the Installation Site unless SSBI notifies Licensor of an installation problem within said ten  (10) day period.

## ARTICLE 3:  ACCEPTANCE

3.1    Acceptance testing of Product shall commence upon installation with such assistance and support as necessary from Licensor personnel.  The acceptance test shall be conducted for the purpose of demonstrating that the Products and Documentation are acceptable to SSBI and perform in accordance with its Specifications, Documentation and any other criteria and procedures mutually agreed upon and set forth in the Schedule.  Sample input selected by SSBI shall be utilized for the acceptance test.  If an acceptance test is not specified on the Schedule, SSBI shall utilize its own internal testing procedures.

3.2    Once the Product has successfully passed the acceptance test, SSBI shall notify Licensor in writing of acceptance of such Product.  If a Product does not pass the acceptance test, SSBI shall notify Licensor, specifying in reasonable detail in what respects the Product has failed to perform.  If SSBI fails to notify Licensor within thirty (30) days, such Product will be deemed accepted.  Licensor shall promptly correct any deficiencies disclosed by the acceptance test and SSBI shall repeat the entire test until the Product has successfully passed.  If the Product fails to pass within forty five (45) days of the date the acceptance test commenced, SSBI shall have the option of immediately terminating the Schedule involved in whole or in part, without obligation, liability or penalty of any kind, including any amounts paid by SSBI for license fees and

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093          Get faxes by email. Free. @eFax.com          Page: 3 of 23

Aug 28 00 03:11p

, MAR 31 '99 05:33PM ACQUISITIONS                                    P.3/24

Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page13 of 39          P.3

pre-paid maintenance or other services under the applicable Schedule, or continuing the acceptance test; provided, however, that SSBI's termination option shall remain available to SSBI during any such continuation.

## ARTICLE 4:  DOCUMENTATION AND TRAINING

4.1     Upon delivery of each Product, Licensor shall deliver to SSBI one (1) copy of all generally available documentation for such Product sufficient to enable SSBI personnel to use and to fully understand the use and operations of the Product ("Documentation").   SSBI may copy the Documentation in order to satisfy its own internal requirements or may request Licensor to furnish additional copies at Licensor's current standard prices, less any applicable discounts.

4.2  In the event that (i) Licensor ceases to provide maintenance services required pursuant to provisions of this Agreement , or (ii) Licensor is liquidated, dissolved or ceases to carry on business on a regular basis, and such business or the part thereof pertaining to SSBI and the obligations connected therewith are not assumed by any successor or assignee of Licensor hereunder, then a current copy of the source code (including assembly, linkage and other utilities), each in machine readable form, (collectively, the "Source Code"), along with any associated documentation, will be immediately made available to SSBI by Licensor and SSBI will have a perpetual license to use such Programs and any Documentation, Source Code and other materials. It is understood and agreed that such Source Code is to be utilized solely for the internal support and maintenance of the Programs and SSBI agrees to maintain the confidentiality of such Source Code in accordance with its obligations as set forth therein.

4.3     If training is required and/or included for a Product, the charge, duration, nature and other particulars applicable to such training shall be specified on the Schedule.

## ARTICLE 5:  SCOPE OF LICENSE AND PROPRIETARY RIGHTS

5.1     Licensor grants to SSBI a non-exclusive irrevocable perpetual license to use each Product, commencing upon its delivery to SSBI and continuing thereafter from the date of SSBI's acceptance of the Product unless terminated earlier in accordance with this Agreement.

5.2     Each license hereunder shall be designated on the Schedule as one of the following:

> 5.2.1 A "CPU Non-Tiered License" shall entitle SSBI to use the Product on the specific central processing unit ("CPU"), designated by model, type and/or serial number on the Schedule.  SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093    Get faxes by email. Free. &Fax.com    Page: 4 of 23

Aug 28 00 03:11p    Case4:10-cv-02797-LB    Document1    Filed06/25/10    Page14 of 39    p.4

MAR 31 '99  05:34PM ACQUISITIONS

P.4/24

5.2.2  An "Installation Site Non-Tiered License" shall entitle SSBI to use the Product on any and all equipment or devices at the Installation Site (including all buildings physically contiguous or directly connected or accessible to each other and any other corporate locations). SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

5.2.3  A "Usage Based License" shall entitle SSBI to use the Product anywhere in the world (unless specific countries are excluded by Licensor on the Schedule) at any sites and on any or all equipment owned, controlled or operated by or for the benefit of SSBI, but not more than the number of concurrent users specified in the Schedule(s) ("Authorized Users"). SSBI shall not be charged any additional License Fees(s) upon SSBI's change in the size or type of the equipment, including, but not limited to, the use of additional MIPS (as defined by Gartner Group) by coupling of equipment and/or use of Parallel Sysplex (as defined by IBM).

5.2.4  A "MIPS Based License" shall entitle SSBI to use the Product anywhere in the world (unless specific countries are excluded by Licensor on the Schedule) at any sites and on all CPUs owned, controlled or operated by or for the benefit of SSBI for up to the number of millions of instructions per seconds ("MIPS", as defined by Gartner Group) specified in the applicable Schedule for which the Product is actually being executed by SSBI in the environment specified in the Schedule (i.e. MVS, VM).

5.2.5  A "U.S. Non-Tiered License" shall entitle SSBI to use the Product anywhere in the United States (including its possessions and territories) at any sites and on all CPUs owned, controlled or operated by or for the benefit of SSBI. SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

5.2.6  A "North American Non-Tiered License" shall entitle SSBI to use the Product anywhere in the United States (including its possessions and territories), Canada and Mexico, at any sites and on all CPUs owned, controlled or operated by or for the benefit of SSBI. SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

5.2.7  A "Country Non-Tiered License" or "Regional Non-Tiered License" shall specify the country or countries comprising a region and shall entitle SSBI to use the Product anywhere at any sites and on all CPUs owned,

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093    Get faxes by email. Free. @eFax.com    Page: 5 of 23

Aug 28 00 03:13p                                                                                        p.5

. MAR 31 '99  05:34PM ACQUISITIONS                                                    P.5/24

controlled or operated by or for the benefit of SSBI within the country or region specified. SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

5.2.8 A "Worldwide Non-Tiered License" shall entitle SSBI to use the Product anywhere in the world (unless specific countries are excluded by Licensor on the Schedule) at any sites and on all CPUs owned, controlled or operated by or for the benefit of SSBI. SSBI shall not be charged any additional License Fee(s) upon SSBI's change in the size or type of the CPU(s), including, but not limited to the use of additional MIPS (as defined by Gartner Group) by coupling of CPUs and/or use of Parallel Sysplex, (as defined by IBM).

5.2.9 Any other type or scope of license mutually agreed upon shall be specified and described on the Schedule.

5.3    Licenses which are granted hereunder, shall include (i) the right of SSBI Entities, joint ventures or partnerships to which SSBI is a partner or joint venturer, to use the Product; and (ii) the right of another party authorized by SSBI to conduct all or any portion of SSBI's information processing services, programming services or network services, to use the Product.

5.4    SSBI may transfer the license to use a Product from one CPU (or server) to another or from one Installation Site to another, from one country or region to another, from any SSBI location to any SSBI Entities location, from SSBI to the applicable third party pursuant to Section 5.3, without payment of any additional fee or charge, so long as the use remains consistent with the scope of that Product's license as specified in Section 5.2, and so long as the Product is not transferred out of the United States. SSBI agrees to provide Licensor with written notice of any such transfer. Each license includes the right to access and use Products in connection with any associated or interconnected networks, peripherals, equipment and devices, unless otherwise specifically prohibited or limited in the Schedule.

5.5    Subject to the payment of the applicable fees, if any, listed in the Schedule(s), Licensor hereby grants SSBI the right to place orders for and copy the Product pursuant to and in quantities set forth in such orders by making a copy of the Product involved, together with any applicable Documentation ("Right to Copy"). SSBI agrees to notify Licensor of all copies made, if applicable. The license for such copy shall commence on the date the additional copy is made by SSBI.

5.6    Each license includes the right to use Products on temporary substitute or back-up equipment. In addition, SSBI shall have the right to use a copy of any Update or any Product provided under this Agreement for "test purposes" in a non-production environment for a limited time. "Test purposes" does not include

Received: 28.Aug.00 03:48 PM From: UnknownSender To: 2403843093
Aug 28 00 03:13p
Case4:10-cv-02797-LB Document1 Filed06/25/10 Page16 of 30
Page: 6 of 23
p. 6
MAR 31 '99 05:35PM ACQUISITIONS
P.6/24

the use of the Update or any Product in a development environment or for development purposes." SSBI shall also be entitled to make and keep copies of each Product and its Documentation at a separate facility for archival and emergency purposes. In the event SSBI relocates the Installation Site or acquires additional hardware, SSBI shall be entitled to the use of a duplicate copy of the Product for the time period necessary to accomplish such relocation or acquisition at no charge to SSBI.

5.7    Licensor retains title to the Products provided hereunder and does not convey any proprietary rights or other interest therein to SSBI, other than the licenses granted hereunder. Licensor agrees that SSBI (i) shall have the right to enhance, modify and/or adapt any of the Products and/or materials provided to SSBI hereunder; and (ii) may create and use derivative works and may use and combine Products with other programs and/or materials. SSBI shall not rent, lease or sell such derivative works.

5.7.1 Notwithstanding anything to the contrary herein, and unless otherwise specified in the Schedule, SSBI shall have title to and the exclusive right to use any enhancements, modifications, adaptations and derivative works made by or for SSBI or by Licensor specifically at SSBI's request or direction pursuant to a specific Schedule executed by both parties.

5.8    In the event SSBI changes the current operating system, Licensor shall provide to SSBI, at no additional charge, a new Product compatible to such changed operating system provided Licensor has developed such new Product and SSBI returns the current Product to Licensor.

ARTICLE 6:  BETA TEST AND TRIAL LICENSE

6.1    If "Beta Test" is specified on the Schedule, then upon delivery of the Product involved ("Test Product"), SSBI shall have a license to use the Test Product, at no cost or financial obligation, for the period of time specified on the Schedule ("Test Period"). SSBI shall evaluate the Test Product and at the end of the Test Period (or at such earlier time as may be mutually agreed upon and specified on the Schedule) provide a report to Licensor, with appropriate comments or suggestions related to SSBI's evaluation.

6.1.1 SSBI acknowledges that Test Products may not yet be commercially available from Licensor and are provided to SSBI solely for testing and evaluation purposes to assist Licensor in refining and/or determining the commercial viability and applicability of the Test Product. Accordingly, Licensor makes no representations or warranties to SSBI concerning the completeness, accuracy or operation of the Test Product and if SSBI attempts to use any such Product for production purposes, then SSBI acknowledges and agrees that Licensor assumes no liability (other than for gross negligence or willful or intentional acts) for any failure

of the Test Product to perform in any manner whatsoever or to achieve any results of any kind for SSBI.

6.1.2  If Licensor subsequently makes a Test Product available in the commercial marketplace, then SSBI shall have the right to license same, as a Product hereunder.

6.2     From time to time, SSBI may wish to evaluate a Product for potential use in its operating environment.  If Licensor agrees to permit such trial, then Licensor shall allow SSBI to use the Product on a Trial License basis, at no fee, cost or other obligation.   Unless another time period is specified on the Schedule, the Trial License shall be for a period of ninety (90) days from the date such Product is installed and operating at SSBI's site.  The parties will indicate "Trial License" on the Schedule for such Product and shall also specify on the same Schedule, the License Fees, scope of license and all other provisions necessary to convert the Trial License to a Product license hereunder, should SSBI wish to do so at any time after the commencement of the Trial License.

6.2.1  At any time before the end of the Trial License period SSBI shall have the option, upon written notice to Licensor, to convert the Trial License to the license as specified on the Schedule or to reject the product, for any reason, and terminate the Schedule without incurring any financial liability, obligation or penalty of any kind.  The commencement of said license (the date the Product is deemed accepted within the meaning of Section 3.2) shall be the date specified in SSBI's notice.

ARTICLE 7:  MAINTENANCE

7.1     During the Acceptance Period specified in Section 3.2 at no charge, and thereafter in consideration of SSBI's payment of the applicable Maintenance Fee during the Annual Maintenance Term (or such other period as is specified on the Schedule), Licensor agrees to provide SSBI with the services specified in this Article 7 as part of its maintenance and support services for Products licensed hereunder.  Licensor agrees to make available maintenance service for each Product for a period of five (5) years from the date of license of said Product.  If Licensor fails to provide such maintenance, SSBI shall be entitled to a pro-rata refund of all license fees made in respect of such Product (calculated on the remaining book value based on a straight line five (5) year basis). Any pre-paid maintenance or other service fees shall be refunded to SSBI in full on a pro-rata basis.

7.2     Licensor shall correct and repair Products, following telephonic, electronic or other notification by SSBI to Licensor of any failure, malfunction, defect or nonconformity which prevents the Product from performing in accordance with the warranties, Documentation, Specifications and other descriptions and/or materials provided to SSBI.

Received: 28.Aug.00  03:48 PM  From: UnknownSender  To: 2403843093  Case4:10-cv-02797-LB  Document1  Filed06/25/10 mail.ecexfax.com  Page18 of 39  Page: 8 of 23

Aug 28 00 03:16p  p.8

. MAR 31 '99  05:35PM ACQUISITIONS  P.8/24

**7.2.1** Licensor shall provide SSBI with notice of all known Priority 1 problems as stated in the attachment titled Customer Support Definitions and Escalation Management Procedures, that could specifically affect the configuration in which SSBI is using the Product, as such problems, become known or are reported to Licensor. Licensor shall promptly correct any such problems, develop a work-around, patch or other fix for such problems and provide same to SSBI.

7.3  Licensor shall respond by telephone (or other confirmed means) to any request for service made during the hours from 6:00 A.M. to 6:00 P.M. (PST), Monday through Friday, excluding holidays observed by SSBI, within one (1) hour of SSBI's initial request for service. If any failure, malfunction, defect or nonconformity cannot be satisfactorily corrected through telephone, electronic or other remote means, and Licensor has attempted to correct such failures, malfunctions, defects or nonconformities through its escalation management procedures described in the attachment Customer Support Definitions and Escalation Management Procedures then SSBI may request reasonable on-site assistance from Licensor and Licensor shall reasonably determine that it should respond by having any necessary maintenance personnel, trained in the Product to be serviced, at the site where such Product is located within seventy two (72) hours of SSBI's initial request for service and apply continuous, dedicated efforts and resources until the problem is resolved. Licensor shall advise SSBI periodically, at reasonable intervals, as to the progress made by Licensor in diagnosing and/or correcting any reported error, defect or nonconformity. Licensor and SSBI may mutually agree to any other problem resolution activities appropriate to the situation in addition to, or instead of the above noted means. If Licensor fails to correct any failure, malfunction, defect or nonconformity characterized by Licensor as a Priority 1 error as described in the attachment Customer Support Definitions, then SSBI shall have the right to terminate the Schedule(s) involved and shall be entitled to a pro-rata refund of all license fee ents made in respect of such Product (calculated on the remaining book value based on a straight line five (5) year basis).

7.4  Licensor shall notify SSBI of all revisions, new versions and releases, updates, improvements, modifications and additional functionality enhancements to each Product which are produced and generally made available by Licensor ("Update") and will deliver to SSBI upon request. Licensor shall not discontinue a product already licensed to SSBI and thereafter replace such product with a functionally similar product and attempt to charge new or incremental license fees to SSB. . In addition, Licensor shall provide such Update to the Source Code described in Section 4.2 and to the Documentation described in Section 4.1 hereof. If any Update is acceptable to SSBI, SSBI shall allow Licensor to install same (or if "SSBI Installed", provide documentation and materials necessary to successfully install such Update) and provide such services as are required, if any, to enable SSBI to continue SSBI's intended use of the Product. If any such Update adversely affects SSBI's use of the Product, SSBI's operations or other systems or processes, in same, and in such event, SSBI can reject such Update and Licensor shall maintain the Product in the form in effect

Page 8

I

Case4:10-cv-02797-LB  Document1  Filed06/25/10  Page19 of 39

immediately prior to Licensor's request that SSBI accept such Update. If Licensor satisfactorily resolves the problems that gave rise to SSBI's refusal, SSBI shall install the Update. For purposes of this Agreement, an Update once incorporated into any Product or Documentation shall be considered a part thereof for all purposes hereunder.

7.5   Licensor shall produce and make available to SSBI any and all modifications to the Products to enable same to operate in conjunction with any new releases of the Licensor's supported operating system.

7.6   Licensor shall provide revised and/or updated Documentation to correspond to any changes (including Updates) made to the Products, within ten (10) days of such changes.

7.7   If SSBI attempts to perform maintenance and/or repair service on the Product and, as a result, further service is required to restore the Product to proper operating condition, such service shall be provided by Licensor hereunder; provided, however, that Licensor shall have the right to charge SSBI for such services at Licensor's then applicable time and materials rates.

7.8   SSBI may elect to extend the hours of maintenance coverage, arrange for on-site or other services available from Licensor and unless otherwise mutually agreed, Licensor shall provide such other services at its then current applicable prices.

7.9   During the initial Maintenance Term and any renewal thereafter, at least sixty (60) days prior to the expiration of each Maintenance Term, Licensor shall notify SSBI in writing of such expiration and SSBI shall have the option to continue the maintenance services for such Product for any additional Maintenance Term selected by SSBI. SSBI shall notify Licensor in writing if it opts to continue a maintenance service for any such continuation. The Maintenance Fee applicable to the initial Maintenance Term and to any continuation of maintenance service of the Maintenance Term ("Maintenance Renewal Fee") shall be eighteen percent (18%) of the current list price of the Product, so long as the Maintenance Renewal Fee to SSBI does not increase by more than five percent (5%) of the Maintenance Fee paid by SSBI to Licensor in any immediately preceding term. Notwithstanding anything herein to the contrary, Maintenance Terms shall continue at no additional charge to the end of the Maintenance Term or for sixty (60) days after receipt of Licensor's notice referred to above, whichever is later, and thereafter, if SSBI exercises the option to continue the maintenance service as provided hereunder.

7.10   SSBI may change the type of and nature of additional services elected hereunder or may terminate maintenance and support services for any Product licensed hereunder, at any time in whole or in part, upon thirty (30) days' written notice to Licensor. Licensor shall refund SSBI any pro-rated portion of the Maintenance Fee SSBI paid to Licensor from date of termination through the date of expiration of the applicable Maintenance Term. Upon such termination, SSBI has the option to continue using the Product without any additional costs.

## ARTICLE 8: INVOICING; PAYMENT; DISCOUNTS

8.1    Licensor may invoice SSBI for the License Fee set forth on the Schedule for each Product, upon delivery of the Product involved to SSBI, in accordance with Section 3.2 hereof.  The License Fee for the Product and for any future Product offered by Licensor shall include no less than the discount specified on the applicable Schedule(s). Invoices should be sent to Salomon Smith Barney Inc., P. O. Box 604, Canal Street Station, New York, NY 10013. Invoices will not be processed without the Salomon Smith Barney contract number being referenced on the invoice and SSBI receiving a fully executed Agreement and applicable Schedule(s).

8.1.1  License Fees applicable to Upgrades, may be invoiced immediately upon Licensor's receipt of SSBI's notification of Upgrade as required hereunder.

8.1.2  License Fees, if any, applicable for each copy of the Product made by SSBI shall be invoiced immediately upon Licensor's receipt of SSBI's notification of such copying.

8.1.3  Maintenance Fees may be invoiced commencing upon expiration of the Acceptance Period and monthly, quarterly, annually or otherwise, in advance thereafter, as specified on the Schedule.

8.1.4  Maintenance Renewal Fees may be invoiced to SSBI at any time after SSBI's notice of renewal and shall be payable within forty-five (45) days of its receipt or on the effective date of the renewal, whichever is later.  Once renewed, the Maintenance Renewal Fee shall be read to mean "Maintenance Fee" for all purposes hereunder.

8.2    Each invoice properly rendered in accordance with this Agreement, shall be payable within forty-five (45) days after its receipt or Acceptance of the product which ever is later, unless otherwise specified herein.

8.3    All License Fees and Maintenance Fees for all Products licensed to SSBI or SSBI Entities shall be discounted at a percentage rate equal to fifteen (15%) percent.  In the event SSBI's cumulative total dollars spent on License Fees with Licensor exceeds $250,000, SSBI shall receive a thirty (30%) percent discount on the order which brings SSBI to that total and all orders going forward. The applicability, availability and calculation of any such discounts shall be effective during the term of the applicable Schedule ("Discount Percentage").

## ARTICLE 9:  WARRANTIES

9.1    Licensor warrants to SSBI that: (i) Licensor has the right to furnish the Products, Documentation, Specifications and other materials and perform the services as specified in this Agreement ("Product Materials and Services") covered hereunder free of all liens, claims, encumbrances and other restrictions;

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093  Get faxes by email Free at eFax.com  Page: 11 of 23

Aug 28 00 03:19p

Case4:10-cv-02797-LB  Document1  Filed06/25/10  Page21 of 39

P.11

, MAR 31 '99  05:36PM ACQUISITIONS

P.11/24

(ii) the Product Materials and Services furnished by Licensor and/or SSBI's use of the same hereunder do not violate or infringe the rights of any third party or the laws of regulations of any governmental or judicial authority; (iii) SSBI shall be entitled to use and enjoy the benefit of the Product Materials and Services, subject to and in accordance with this Agreement; and (iv) SSBI's use and possession of the Product Materials and Services hereunder, shall not be adversely affected, interrupted or disturbed by Licensor or any entity asserting a claim under or through Licensor.

9.2    Licensor warrants that: (i) all tangible portions of the Product Materials and Services shall be free from any defects in materials and workmanship and the Products shall conform to and operate in accordance with the Specifications for such Products, the Documentation provided to SSBI by Licensor hereunder and such other descriptions and materials as are attached, described and/or provided under this Agreement; and (ii) the Specifications and Documentation and other materials provided by Licensor hereunder shall faithfully and accurately reflect the Products provided to SSBI hereunder.

9.3    Licensor warrants that for a period of ninety (90) days (or such other period as is specified on the Schedule) after the Product is deemed accepted pursuant to Section 3.2 ("Warranty Period") it shall correct and repair any malfunction, defect or nonconformity which prevents such Product from performing in accordance with the provisions of this Agreement at no additional charge to SSBI.

9.4    Licensor warrants that, upon the expiration of the Acceptance Period, and in consideration of the applicable Maintenance Fees hereunder, it shall perform the maintenance and support services as specified in this Agreement.

9.5    Licensor warrants to SSBI that Updates to the Products provided to SSBI hereunder shall not degrade, impair or otherwise adversely affect the performance or operation of the Products provided hereunder.

9.6    Licensor warrants that any installation, maintenance or other services provided by Licensor hereunder shall be performed in a high quality, professional manner by qualified personnel. Licensor personnel will observe and comply with SSBI's security procedures, rules, regulations, policies, working hours and SSBI's holiday schedules.  In performing services at SSBI locations, Licensor personnel will use best efforts to minimize any disruption to SSBI's normal business operations.

9.7    Licensor warrants that the Product does not contain a lockup program or device.  Licensor further agrees that it will not, under any circumstances including enforcement of a valid contract right, install or trigger a lockup program or device which in any manner interferes with SSBI's use of the Product and/or restricts SSBI from accessing its data files or in any way interferes with the transaction of SSBI's business. Failure to strictly abide by the terms of this section shall expose Licensor to unlimited compensatory damages as well as punitive damages and any attorney fees and other costs a court may award.

Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page22 of 39

Further, Licensor understands and agrees that SSBI, in addition to seeking damages as set out above, may secure an injunction ordering Licensor to immediately remove any software lockup program or device that is installed in the Product.

9.8     Licensor warrants that the Product shall contain no viruses.


9.9     Licensor represents and warrants that the Products will properly record, store, process, print, manage and present calendar dates (and data involving or based on calendar dates) falling on or after January 1, 2000, in the same manner, and with the same functionality, accuracy, data integrity and performance, as the Products records, stores, processes, prints, manages and presents dates (and data involving or based on dates) falling on or before December 31, 1999. Licensor also represents and warrants that the Products will not suffer any degradation in functionality with respect to the introduction or processing of records containing dates falling on or after January 1, 2000 and that the Products will properly operate in connection with other software, if such software is supported by Licensor, used by SSBI which interacts with the Products, including without limitation, other software which delivers records to, or receives records from, the Products. Such Licensor supported software shall be published on Licensor's web site and such list shall be delivered to SSBI at any time upon request. Licensor further represents that the Products have been tested for such performance and will provide SSBI with such data regarding such testing to support SSBI's verification of such performance and compliance with the foregoing representations and warranties. Licensor further agrees that SSBI shall have the right to conduct such testing as SSBI reasonably deems necessary to ensure that the Products complies with the foregoing representations and warranties, and Licensor agrees to cooperate with, support and participate in such testing as required by SSBI. Additionally, the Licensor warrants that the Products will recognize the Year 2000 as a leap year. Licensor agrees that the foregoing functionality, and Licensor's obligations in connection therewith shall be provided at no additional cost.


9.10   EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRE SSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.


9.11   LICENSOR'S LIABILITY HEREUNDER FOR DAMAGES ARISING OUT OF THE PERFORMANCE OR NONPERFORMANCE OF THE PRODUCT SHALL NOT EXCEED TWICE THE AMOUNTS PAID BY SSBI TO LICENSOR HEREUNDER PROVIDED HOWEVER THAT THE FOREGOING SHALL NOT APPLY TO ARTICLE 11 CONFIDENTIAL INFORMATION, CLAIMS OF PERSONAL INJURY CAUSED BY LICENSOR'S FAULT OR NEGLIGENCE, ANY DAMAGE CAUSED BY LICENSOR'S WILLUL, DELIBERATE OR MALICIOUS ACTS, DAMAGE TO REAL PROPERTY OR TANGIBLE PERSONAL PROPERTY CAUSED BY LICENSOR'S FAULT OR NEGLIGENCE, THE PAYMENT OF DAMAGES, COSTS AND REASONABLE ATTORNEY'S

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093    **Get faxes by email. Free. Fax.com**    Page: 13 of 23

Aug 28 00 03:21p    Case4:10-cv-02797-LB  Document1  Filed06/25/10  Page23 of 39    p.13

. MAR 31 '99  05:37PM ACQUISITIONS    P.13/24

FEES REFERRED TO IN ARTICLE 10,AND INTELLECTUAL PROPERTY INFRINGEMENT. IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, LOSS OF DATA OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, ARISING IN ANY WAY OUT OF THIS AGREEMENT UNDER ANY CAUSE OF ACTION, WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## ARTICLE 10: INTELLECTUAL PROPERTY INFRINGEMENT

10.1   Licensor agrees to defend and/or handle at is own expense, any claim or action against SSBI, and/or any SSBI Entity and their respective directors, officers, employees and agents for actual or alleged infringement of any intellectual or industrial property right, including, without limitation, trademarks, service marks, patents, copyrights, misappropriation of trade secrets of any similar proprietary rights, based upon the Product Materials and Services furnished hereunder by Licensor or based on SSBI, and/or any SSBI Entity and their respective directors, officers, employees and agents use thereof. Licensor further agrees to indemnify and hold SSBI, and/or any SSBI Entity and their respective directors, officers, employees and agents harmless from and against any and all liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees) associated with any such claim or action. Licensor shall have the sole right to conduct the defense of any such claim or action and all negotiations for its settlement or compromise, unless otherwise mutually agreed to in writing.

10.2   If any Product Materials and/or Services become, or in Licensor's opinion are likely to become, the subject of any such claim or action, then, Licensor, at its expense may either: (i) procure for SSBI the right to continue using same as contemplated hereunder; (ii) modify same to render same non-infringing (provided such modification does not adversely affect SSBI's use as contemplated hereunder); or (iii) replace same with equally suitable, functionally equivalent, compatible, non-infringing products, materials and/or services. If none of the foregoing are commercially practicable, Licensor having used all reasonable efforts, then SSBI shall have the right to terminate the Schedule(s) involved and shall be entitle to a pro-rata refund of all payments made in respect of such Product (calculated on the remaining book value based on a straight line five (5) year basis).

## ARTICLE 11: CONFIDENTIAL INFORMATION

11.1   Licensor agrees to regard and preserve as confidential all information related to the business and activities of SSBI and the SSBI Entities, their customer, clients, suppliers and other entities with whom SSBI and the SSBI Entities do business, that may be obtained by Licensor from any source or may be developed as a result of this Agreement, including but not limited to, trade secrets, processes, data, know-how, inventions, marketing plans and strategies. Licensor agrees to hold such information in trust and confidence for SSBI and

Received: 28.Aug.00 03:48 PM From: UnknownSender To: 2403843093    Get faxes by email. Free. eFax.com    Page: 14 of 23

Aug 28 00 03:23p    P.14

Case4:10-cv-02797-LB Document1 Filed06/25/10 Page24 of 39

MAR 31 '99 05:38PM ACQUISITIONS    P.14/24

not to disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party, unless authorized by SSBI in writing, and even then, to limit access to and disclosures of such confidential information to Licensor's employees on a "need to know" basis only.

11.2    SSBI acknowledges that Licensor considers any materials labeled "Confidential" at the time of their delivery to SSBI, to be confidential and trade secrets of Licensor and SSBI agrees that unless SSBI has obtained Licensor's written consent, SSBI shall keep such "Confidential" materials confidential and prevent their disclosure to any person other than employees or representatives of SSBI for purposes specifically related to SSBI's permitted use of the Products, provided such level of protection always being at least that used by SSBI to protect its own confidential information or trade secrets. Licensor agrees that SSBI retains the right to use any ideas, concepts, know-how or techniques disclosed by Licensor pursuant to this Agreement.

11.3    Information shall not be considered confidential to the extent, but only to the extent, that such information is: (i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; or (iv) is independently developed by one party without reference to any Confidential Information of the other.

11.4    Both parties acknowledge and agree that in the event of a breach or threatened breach by it of the provisions of this Article 11, "Confidential Information", SSBI, its parent company and its subsidiaries and affiliated companies or Licensor will have no adequate remedy in money or damages and, accordingly, shall be entitled to an injunction in a court of competent jurisdiction against such breach. Both parties will cooperate as reasonably requested by the other to prevent or curtail such threatened or actual breach of this Article 11.

ARTICLE 12: GENERAL

RISK OF LOSS OR DAMAGE:  SSBI shall be responsible for all risks of physical loss or damage to the Products (except loss or damage caused by the fault or negligence of Licensor) commencing at the time Product is delivered and accepted to SSBI's possession at the Installation Site. The maximum liability of SSBI for physical loss or damage to any Product provided hereunder, if SSBI shall be liable under the terms of this Section, shall be the actual cost of reproducing the Product onto new media.

YEAR 2000 COMPLIANCE CAPABILITIES:  The Products licensed to SSBI shall be able to:

1.    manage and manipulate data involving dates, including single-century formulas and multicentury formulas, and will not cause an abnormally

Received: 28.Aug.00 03:48 PM From: UnknownSender To: 2403843093    Get faxes by email. Free. @Fax.com    Page: 15 of 23

Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page25 of 39

Aug 28 00 03:24p                             p. 15

MAR 31 '99 05:38PM ACQUISITIONS               P.15/24

ending scenario within the application or result in the generation of incorrect values involving such dates;

2.   ensure that all date-related user interface functionalities and data fields include the indication of century;

3.   Ensure that all date related functions will include the indication of century.

<u>TERM AND TERMINATION:</u>  This Agreement shall commence as of the Effective Date and continue thereafter unless terminated as provided hereunder. Each Schedule shall become binding when duly executed by both parties and shall continue thereafter unless terminated as permitted hereunder. Notice of termination of any Schedule shall not be considered notice of termination of this Agreement.

<u>TAXES:</u>  SSBI agrees to pay all taxes levied against or upon the Products and any services or their use hereunder, exclusive, however, of personal property taxes, franchise taxes, corporate excise or corporate privilege, property or license taxes or taxes based on Licensor's net income or gross revenues of Licensor, which taxes shall be paid by Licensor or any other taxes levied on Licensor, which are not required by law to be collected from SSBI. If any tax for which SSBI is responsible hereunder is paid by Licensor, SSBI will reimburse Licensor upon SSBI's receipt of proof of payment. SSBI shall not be liable and shall have no obligation to pay any penalties, interest, or late charges imposed as a result of Licensor's failure to pay taxes on a timely basis. Licensor shall notify SSBI, in writing, within ten (10) days of any State tax audit which can cause SSBI's obligation to pay any additional taxes hereunder. Failure of Licensor to so notify SSBI shall release SSBI of any obligation to pay any penalties or interest assessed as a result of such audit. All applicable taxes shall be separately stated on the invoice in which they apply. If any expenses are approved by SSBI, they shall be separately stated on the invoice submitted.

<u>LIABILITY:</u>  Licensor shall be liable for and shall indemnify and hold SSBI harmless from any loss or damage arising from the fault or negligence of Licensor, its officers, employees, agents and representatives. SSBI shall be liable for and shall indemnify and hold Licensor harmless from any loss or damage arising from the fault or negligence of SSBI, its officers, employees, agents and representative.

<u>FORCE MAJEURE:</u>  In no event shall either party be liable to the other for any delay or failure to perform hereunder, which delay or failure to perform is due to causes beyond the control of said party, including, but not limited to, acts of God; acts of the public enemy; acts of the government of the United States of America or any State, territory or political division of the United States of America, or of the District of Columbia; fires; flood; epidemics; quarantine restrictions; strikes; riots; and freight embargoes. Notwithstanding the foregoing, in every case the delay or failure to perform must be beyond the control and without the fault or negligence of the party claiming excusable delay. Performance times under this

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093          Get faxes by email. Free. eFax.com          Page: 16 of 23

Aug 28 00 03:25p                Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page26 of 39          p.16

MAR 31 '99 05:38PM ACQUISITIONS                                                    P.16/24

Agreement shall be considered extended for a period of time equivalent to the
time lost because of any delay which is excusable under this Section. If any
such excusable delay shall last, in the aggregate, for a period of more than sixty
(60) calendar days, the party not relying on the excusable delay, at its option,
may terminate the applicable Schedule, in whole or in part, without penalty or
financial obligation of any kind.

MATERIAL BREACH: In the event of any material breach of this Agreement by
one party, the other party may (reserving cumulatively all other remedies and
rights under this Agreement and in law and in equity) terminate the Schedule(s)
involved, in whole or in part, by giving thirty (30) days' written notice thereof;
provide, however, that any such termination shall not be effective if the party in
breach has cured the breach of which it has been notified prior to the expiration
of said thirty (30) days.

CONTINUATION OF LICENSE: In the event of any termination by SSBI as a
result of Licensors breach in accordance with the Material Breach provision
above, SSBI shall, effective as of the date of such termination, have a perpetual
license to use the Product, Documentation and any other items provided
hereunder without further charge or fee, but otherwise subject to and in
accordance with the provision of this Agreement.

NOTICES: Unless otherwise specified all notice shall be in writing and delivered
personally or mailed, first class mail, postage prepaid, to the addresses of the
parties set forth at the beginning of this Agreement, to the attention of the
undersigned; provided, however, that any Licensor notice of material breach to
SSBI shall be sent to Technology Contracts Department , 388 Greenwich Street,
14th Floor, New York, New York 10013, Attention: First Vice President. As to
any Schedule, notices shall also be sent to the signatories of the Schedule
involved. Either party may change the address(es) or addressee(s) for notice
hereunder upon written notice to the other. All notices shall be deemed given on
the date delivered or when placed in the mail as specified herein.

ADVERTISING OR PUBLICITY: Neither party shall use the name or marks,
refer to or identify the other party in advertising or publicity releases, promotional
or marketing correspondence to others without first securing the written consent
of such other party.

ASSIGNMENT: Neither party may assign this Agreement, any Schedule and/or
any rights and/or obligations hereunder without the written consent of the other
party and any such attempted assignment shall be void; provided, however, that
SSBI may assign this Agreement, any Schedule and/or any of its rights and/or
obligations hereunder upon written notice to Licensor without the consent of
Licensor to any SSBI Entity, or to SSBI's successor pursuant to a merger,
consolidation or sale of all or substantially all of its assets and Licensor may
assign this Agreement and/or any of its rights and/or obligations hereunder upon
written notice to SSBI without the consent of SSBI or successor pursuant to a
merger consolidation or sale of all or substantially all of its assets. This

Received: 28.Aug.00 03:48 PM  From: UnknownSender  To: 2403843093

Aug 28 00 03:26p

Get faxes by email. Free. eFax.com

Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page27 of 39

Page: 17 of 23

p.17

MAR 31 '99  05:39PM ACQUISITIONS

P.17/24

Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and permitted assigns.

DIVESTITURE:  Any subsidiary, affiliate, department or division of SSBI that loses its status or any department or division of a subsidiary or affiliate that loses its status, shall have the right to use the Product for a period of up to one (1) year after the loss of its status, without any additional costs.

GOVERNING LAW:  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to a conflict of law principals.

MODIFICATION,  AMENDMENT,  SUPPLEMENT  AND  WAIVER:  No modification, course of conduct, amendment, supplement to or waiver of this Agreement, any Schedule, or any provisions hereof shall be binding upon the parties unless made in writing and duly signed by both parties.  At no time shall any failure or delay by either party in enforcing any provisions, exercising any option, or requiring performance of any provisions, be construed to be a waiver of same.

SEVERABILITY:  In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provisions shall be replaced by a mutually acceptable provision, which, being valid, legal and enforceable, comes closest to the intention of the parties underlying the invalid, illegal or unenforceable provision.

CUMULATIVE REMEDIES:  Except as expressly provided to the contrary herein, all remedies set forth in this Agreement are cumulative, and not exclusive of any other remedies of a party at law or in equity, statutory or otherwise.

HEADINGS:  Headings are for reference and shall not affect the meaning of any of the provisions of this Agreement.

THIS AREA IS INTENTIONALLY LEFT BLANK

Received: 28.Aug.00 03:48 PM From: Unknown Sender To: 34038420091 Get faxes by email. Free. @eFax.com

Aug 28 00 03:26p                                                                                    Page: 18 of 23

Case4:10-cv-02797-EB  Document1  Filed06/25/10  Page28 of 39

                                                                                                        P.18

MAR 31 '99  05:39PM ACQUISITIONS                                                        P.18/24

<u>ENTIRE AGREEMENT</u>:  The Exhibits, Schedules and attachments to this Agreement are incorporated by this reference and shall constitute part of this Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all previous agreements, promises, proposals, representations, understanding and negotiations, whether written or oral, between the parties respecting the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day, month and year first written above.

Licensor:                                         **SALOMON SMITH BARNEY INC.**

By: _____           By: _____

Name: _____           Name:  Michael F. Weinberg

Title:  CFO                                        Title:  Managing Director
       (type or print)

Date:  3/31/99                              Date:  March 31, 1999

Page 18

Case4:10-cv-02797-LB   Document1   Filed06/25/10   Page29 of 39

## EXHIBIT A

Schedule Number: _____     Dated: _____

Agreement Number: _____

This Schedule is issued pursuant to the above-referenced License Agreement (the "Agreement"), between Salomon Smith Barney Inc., and the Licensor specified below.

Beta Test: _____     Trial License: _____
Test Period: _____

<u>Installation Site:</u>                          <u>Scheduled Delivery Date:</u>

| <u>PRODUCTS</u> | <u>SCOPE</u> | <u>LICENSE FEE</u> | <u>DISCOUNT %</u> | <u># OF AUTHORIZED USERS (IF APPLICABLE)</u> | <u># OF COPIES, (IF APPLICABLE)</u> | <u>RIGHT TO COPY, (RELIEVES OR NO)</u> | <u>LICENSE FEE FOR EACH COPY IF APPLICABLE</u> |
|---|---|---|---|---|---|---|---|

*Identify CPU and/or number of MIPS and MIPS environment, if applicable:

Total License Fees:        $

Total Maintenance Fees:    $

Warranty Period:
_____

Maintenance Fee Paid: (select one) __annually __quarterly __monthly (upon expiration of Warranty Period)

Specifications:  See attached <u>Annex 1</u> to this Schedule

Acceptance Test Criteria and Procedures: See attached <u>Annex 2</u> to this Schedule

<u>Additional Provisions and Conditions (if any):</u>

1.0   SSBI shall not process any invoices without the Salomon Smith Barney Contract number being referenced on the invoice and SSBI receiving a fully executed Schedule.

| LICENSOR: | | SALOMON SMITH BARNEY INC. | |
|---|---|---|---|
| By: | _DQ Gaucher_ | By: | _____ |
| Name: | _____ | Name: | Michael F. Weinberg |
| Title: | _____ (type or print) | Title: | Managing Director |
| Date: | _____ | Date: | _____ |

Schedule Number:    __AAY98L-001__        Dated:    __March 31, 1999__

Agreement Number:   __AAY98L-000__

This Schedule is issued pursuant to the above-referenced License Agreement (the "Agreement"), between Salomon Smith Barney Inc., and the Licensor specified below.

<u>Installation Site:</u>    TBD        <u>Scheduled Delivery Date:</u>    Upon    execution of this Schedule

| PRODUCTS | SCOPE | QTY | Price Per | LICENSE FEE | # OF AUTHORIZED USERS. | Total Maintenance Cost 18% | DISCOUNT % |
|---|---|---|---|---|---|---|---|
| Report Server | CPU-based Unlimited Users | | 4 CPU- $20,000 | $ 80,000.00 | Unlimited | $ 14,400.00 | 30% |
| Report Server | 10 User Developer License (Test Environment) | | 5 Server- $5,000 | $ 25,000.00 | 10 per Server | $ 25,000.00 | 30% |
| Developer Workbench | Usage Based License | | 5 User- $2,000 | $ 10,000.00 | 5 per User | $ 1,800.00 | 30% |
| Actuate Administrator Desktop | Usage Based License | | 1 Desktop- $600 | $ 600.00 | 1 per Desktop | $ 108.00 | 30% |
| Actuate Web Agent Internet Interface | | | 1 Interface- $5,000 | $ 5,000.00 | Unlimited | $ 900.00 | 30% |
| Totals | | | | $ 120,600.00 | | $ 21,708.00 | |
| Less Discount | | | | $ 36,180.00 | | $ 6,512.40 | |
| | | | Net License Fee | $ 84,420.00 | Net Maintenance (on Net) | $ 15,195.60 | |
| Total Cost of Software and Maintenance | | | | | | $99,615.60 | |

Total License Fees:        $  84,420

Total Maintenance Fees:    $  15,195.60

Warranty Period:        90 days

Initial Maintenance Period        15 months

Maintenance Fee Paid: (select one) X_ annually ___quarterly ___monthly (upon expiration of Warranty Period)

Received: 28.Aug.00 03:48 PM From: UnknownSender To: 2403843093

Aug 28 00 03:28p

MAR 31 '99 05:39PM ACQUISITIONS

Page: 21 of 23

p.21

P.21/24

Case4:10-cv-02797-LB Document1 Filed06/25/10 Page31 of 39

Additional Provisions and Conditions (if any):

1.0    SSBI shall not process any invoices without the Salomon Smith Barney Contract number being referenced on the invoice and SSBI receiving a fully executed Schedule.

| LICENSOR: | | SALOMON SMITH BARNEY INC. | |
|---|---|---|---|
| By: | | By: | |
| Name: | | Name: | Michael F. Weinberg |
| Title: | (type or print) | Title: | Managing Director |
| Date: | | Date: | March 31, 1999 |

Received: 28.Aug.00 03:48 PM From: UnknownSender To: 2403843093 Get faxes by email Page: 22 of 23
Aug 28 00 03:28p Case4:10-cv-02797-LB Document1 Filed06/25/10 Page32 of 39 Page: 22 of 23
P.22
. MAR 31 '99 05:40PM ACQUISITIONS P.22/24

Attachment
Customer Support Definitions
and
Esaclation Management Procedures

The following is the Licensor's definitions of Service Level problems.

Priority 1: Down production system

The Product is failing in a production environment resulting in a complete loss of productive capability. This type of problem severally impacts SSBI's business objectives and requires rapid response and resolution. Examples: non-recoverable server crash, complete failure of one of the Products components

Priority 2: Major feature failure

One of the major functions or features of the Product is failing. This type of problem also requires rapid response and resolution. Examples: major feature failure and the failure of reports to run, return of incorrect results by a Product's API function

Priority 3: Feature of not working as documented

A feature in the Product is not behaving as documented by Licensor. Productive work can continue but the Product is not performing to specification and a remedy is required.

Priority 4: General Questions

These problems are of a general nature and pertain to how the Product should operate in both a production and development environment. Example: when a particular report does not run while others run normally. This feature includes requests for subsequent releases.

Notwithstanding anything to the contrary in Article 7 Maintenance, the following is Licensor's escalation management procedures.

| Service Levels | Priority 1 | Priority 2 | Priority 3 | Priority 4 |
|---|---|---|---|---|
| Acknowledgement | 1 hour | 1 hour | 4 hours | 6 hours |
| Response | 1 hour | 1 hour | 10 hours | 12 hours |
| Status Frequency | Daily | Every 3 days | Every 5 days | Every 7 days |
| Temporary Fix | 2 days | 8 days | 10 days | 12 days (if applicable) |
| Permanent Fix | Next Maintenance Release | Next Maintenance Release | Next Maintenance Release or Enhancement Release | Next Enhancement Release |

Definitions:

Acknowledgement: Contact by either e-mail or telephone by a trained Customer Support professional to advise of the receipt of the customer support issue.

Initial response: Contact by either e-mail or telephone by a trained Customer Support professional to gather additional information about the customer support issue and to determine required steps to reproduce the problem

Status Frequency: Licensor Customer Support will update SSBI on its open issues.

**Temporary Fix**  This is a relief from the experienced behavior. It may take the form of a workaround, a patch or an alternate design approach.

**Maintenance release:** These are regularly scheduled software releases that contain fixes for unwanted behavior, pursuant to Article 7 of the Agreement. These releases will rarely contain new functionality.

**Enhancement release:** These are regularly scheduled software releases that contain both bug fixes and new functionality, pursuant to Article 7 of the Agreement.

# EXHIBIT  B

**SCHEDULE NUMBER:**     AAY98L-013     **EFFECTIVE DATE:** December 29, 2004

**AGREEMENT NUMBER:**     AAY98L-000

This Schedule No. AAY98L-013 is entered into as of the Effective Date designated above, by and between the Licensor and the Licensee designated below. The parties hereto acknowledge that they are entering into this Schedule pursuant to the provisions of the Master Perpetual License Agreement, dated as of March 31, 1999, by and between Actuate Corporation ("Licensor") and Salomon Smith Barney Inc., n/k/a Citigroup Global Markets Inc. (the "Agreement"). The parties further acknowledge and agree that the provisions of the Agreement shall be incorporated into this Schedule as though such provisions were set forth herein in their entirety. For the avoidance of doubt, the Licensee designated below is an Entity as that term is defined in the Agreement.

**INSTALLATION SITE:**     Multiple

**SCHEDULED DELIVERY DATE:**     Upon execution of this Schedule.

1.     Licensee agrees to pay Licensor a License Fee in the amount of $:

2.     In consideration for the License Fee, Licensee shall acquire a license to the following Products:

| Qty | Product Description | Unit Price | Extended | Discount | Total |
|---|---|---|---|---|---|
| *Production Software* | | | | | |
| 1700 Named Users | iServer Base w/eReport Option | | | | |
| 1700 Named Users | Page Level Security Option | | | | |
| 1700 Named Users | Data Connector for Peoplesoft Option | | | | |
| 1700 Named Users | e.Spreadsheet Option | | | | |
| | *Production Software Subtotal* | | | | |
| 1st year | Standard Maintenance on Production Software | | | | |
| | *Production Total* | | | | |
| | | | | | |
| *Software for User Acceptance/Testing (UAT) Use Only* | | | | | |
| 200 Named Users | iServer Base w/eReport Option | | | | |
| 200 Named Users | Page Level Security Option | | | | |
| 200 Named Users | Data Connector for Peoplesoft Option | | | | |
| 200 Named Users | e.Spreadsheet Option | | | | |
| | *UAT Software Total* | | | | |
| 1st year | Standard Maintenance on UAT Software | | | | |
| | *UAT Total* | | | | |
| | | | | | |
| *Software for Development Use Only* | | | | | |
| 10 Named Developers | Developer Pack | | | | |

| | | | |
|---|---|---|---|
| | **Development Software Total** | | |
| 1st year | Standard Maintenance on Development Software | | |
| | **Development Total** | | |
| | | | |
| | **Total Software and Maintenance** | | |

3.      Licensee agrees to pay Licensor the initial year's Maintenance Fee for standard support for the Products in the amount of $.

4.      The License Fee and the Maintenance Fee shall be invoiced upon execution of this Schedule and payable net sixty (60) days after Licensee's receipt of a properly rendered invoice.

5.      With respect to any Product licensed by Licensee which is designated as a "Named User License", and thereby limited to a specified number of named individual users, the following shall apply, and Licensee agrees to use such Product only in accordance with the following restrictions:

A Named User means and includes any Personnel (as that term is defined below) of Licensee, including any customer of Licensee, who receives reports managed or generated by the iServer Product. Named Users are authorized by Licensee to access the iServer Product to view such reports. Reports may be received by email or by hardcopy. A Named User license allows only a specific number of Named Users, as set forth above, to access the iServer Product or view reports generated by the iServer Product. No other users are licensed to access the iServer Product or view reports generated by the iServer Product at any time. Personnel means and includes Licensee's directors, officers, employees, agents, auditors, consultants, and subcontractors.

6.      With respect to any Product licensed by Licensee which is designated as a "Named Developer License", the following shall apply and Licensee agrees to use such Product only in accordance with the following restrictions:

Named Developer License Product is charged on a *per developer* basis, and thus each license may be accessed or used for development purposes by only a single, identified developer.

7.      Licensor agrees that, for no more than three periods ("Excessive Use Period") (such periods to be determined by Licensee in its sole discretion) per year and upon prior written notification to Licensor, Licensee may increase the number of Named Users licensed to use the UAT Product, as set forth in the table above, from 200 Named Users to no more than 1,700 Named Users. In no event will any Excessive Use Period exceed six (6) consecutive weeks.

8.      Licensee agrees that the Products licensed hereunder shall be accepted upon shipment.

9.      In the event that there is an inconsistency between the Agreement and this Schedule, the provisions of this Schedule shall govern for purposes of this Schedule.

**IN WITNESS WHEREOF**, the parties by their duly authorized representatives have executed this Schedule as of the date set forth above.

**Citigroup Technology, Inc.**                    **Actuate Corporation**

By: _____              By: _____
        DIANE VOLLMER, DIRECTOR
Name: Technology Financial Management        Name: Dan Goodman
              (212) 615-9858
Title: _____            Title: 1/4/05

                12/29/04

# EXHIBIT  C

# ACTUATE.

# INVOICE

FED ID#: 94-3193197
CAN GST#: 86877-0082

Actuate Corporation
701 Gateway Blvd.,
6th Floor
South San Francisco, CA 94080-7009
Phone: 650-837-2000
Fax: 650-827-1560

| CONTRACT REF | CUSTOMER NO. | DATE | INVOICE NO |
|---|---|---|---|
| ACT00006308-000 | C0000224-55 | 4/30/2006 | US-00046523 |

Page     1

| BILL TO | SHIP TO |
|---|---|
| Attn: Rick Ganz<br>Banc of America Leasing & Capital (C0000224-55)<br>C/O Chesapeake Management Co, LLC.<br>7090 Samuel Morse Dr.<br>Columbia MD 21045<br>United States | Attn: Rick Ganz<br>Chesapeake Management Co, LLC (C0000224-56)<br>7090 Samuel Morse Dr<br>Columbia MD 21045<br>United States |

| PO NUMBER | TERMS | REP | SHIP DATE | SHIP VIA | FOB |
|---|---|---|---|---|---|
| 12-099-010 | Net 45 | KBA | 4/28/2006 | FedEx#18421;FTP | Destination |

| QTY | UOM | DESCRIPTION | UNIT PRICE | GROSS AMT | DISCOUNT | PRETAX AMT | TAX AMT | NET AMT |
|---|---|---|---|---|---|---|---|---|
| 400 | USR | e.Report Option (Prod) | 500.00 | 200,000.00 | (60,000.00) | 140,000.00 | 0.00 | 140,000.00 |
| 50 | USR | e.Report Option (UAT) | 500.00 | 25,000.00 | (7,500.00) | 17,500.00 | 0.00 | 17,500.00 |
| 50 | USR | e.Report Option (Train) | 500.00 | 25,000.00 | (7,500.00) | 17,500.00 | 0.00 | 17,500.00 |
| 50 | USR | e.Report Option (Dev) | 500.00 | 25,000.00 | (7,500.00) | 17,500.00 | 0.00 | 17,500.00 |
| 50 | USR | e.Report Option (SIT) | 500.00 | 25,000.00 | (7,500.00) | 17,500.00 | 0.00 | 17,500.00 |
| 1 | | Standard Support & Maintenance | 37,800.00 | 37,800.00 | | 37,800.00 | 0.00 | 37,800.00 |
| | | Standard Support & Maintenance from 4/28/2006 until 4/27/2007 | | | | | | |
| 1 | EA | Freight | 200.00 | 200.00 | | 200.00 | 0.00 | 200.00 |
| | | **TOTAL** | | **338,000.00** | **(90,000.00)** | **248,000.00** | **0.00** | **248,000.00** |

| | |
|---|---|
| Software Version: | Version 8.0 SP1 |
| Maintenance Terms: | N; 18% |
| Renewal Terms: | FN; 18% with 5% cap |
| Tax Exempt: | 09501241 |

| Please Remit Payment To: | | |
|---|---|---|
| Actuate Corporation<br>Dept. #05875<br>P.O. Box 39000<br>San Francisco, CA 94139-5875 | Subtotal | 248,000.00 USD |
| | Tax Total | 0.00 USD |
| | Paid Amt | 0.00 USD |
| | **TOTAL** | **248,000.00 USD** |
| | **DUE DATE** | **6/14/2006** |

US-EAST

# First American
# PURCHASE ORDER

| PURCHASE | ☑ | ORDER # |
|---|---|---|
| LEASE | ☐ | 12-099-0010 |

| DATE: | 4/20/2006 | COMPANY CODE: | | VENDOR INFORMATION | |
|---|---|---|---|---|---|
| SHIP VIA | | COST CENTER / DIVISION | | Name: | Actuate Corporation |
| | | | | Address 1: | |
| FOB | Origin | GL ACCOUNT #: | | Address 2: | |
| | | | | City: | |
| TERMS | | OTHER | | State: | |
| | | | | Zip: | |
| | | | | Attn: | |
| | | | | Email: | |
| | | | | Phone: | |

| SOLD TO: | DELIVER TO: | BILL TO: | ORDERED BY: |
|---|---|---|---|
| ☐ | | Banc of America Leasing & Capital, LLC c/o Chespeake Management Company, LLC 7090 Samuel Morse Dr. | |
| ☐ | | | |
| Chesapeake/FIRST AME | Name: Chespeake Management Company, LLC | Name: | Name: Chespeake Management Company, LLC 7090 Samuel Morse Dr. |
| ☑ OTHER: BANC OF AMERICA LEASING & CAPITAL LLC | Address 1: 7090 Samuel Morse Dr. | Address 1: | Address 1: |
| | Address 2: | Address 2: | Address 2: |
| | City: Columbia | City: Columbia | City: Columbia |
| | State: MD | State: MD | State: MD |
| | Zip: 21045 | Zip: 21045 | Zip: 21045 |
| | Attn: Rick Ganz | Attn: Rick Ganz | Attn: Rick Ganz |
| | Email: | Email: | Email: |
| | Phone: 443-259-1566 | Phone: 443-259-1566 | Phone: 443-259-1566 |

| ITEM # | QTY. | UNIT | PART # | DESCRIPTION | UNIT PRICE | EXT. PRICE |
|---|---|---|---|---|---|---|
| 1 | | | | See attached Quote # NCA 110 | | 247,800.00 |
| 2 | | | | | | |
| 3 | | | | | | - |
| 4 | | | | | | - |
| 5 | | | | | | - |
| 6 | | | | | | - |
| 7 | | | | | | - |
| 8 | | | | | | - |
| 9 | | | | | | - |
| 10 | | | | | | - |
| 11 | | | | | | - |
| 12 | | | | | | - |
| 13 | | | | | | - |
| 14 | | | | | | - |
| 15 | | | | | | - |

| COMMENTS: Please note the following:1. These items are being sold to Banc of America Leasing & Capital, LLC, One Financial Plaza, Providence, RI 02903. 2. We will require an original invoice to be delivered to the attention of Rick Ganz at the address shown above. 3. Please provide wire transfer instructions, if possible. 4. Please reference Lease Approval Code 12-099-0010 on all documentation related to this purchase. | SUBTOTAL | 247,800.00 |
|---|---|---|
| | TAX | - |
| | FREIGHT | |
| | MISC | |
| | GRAND TOTAL $ | 247,800.00 |

| REQUISITIONED BY: | | | | |
|---|---|---|---|---|
| | NAME | TITLE | DATE | SIGN |

| AUTHORIZED BY: | | | | |
|---|---|---|---|---|
| | NAME | TITLE | DATE | SIGN |

| AUTHORIZED BY: | | | | |
|---|---|---|---|---|
| | NAME | TITLE | DATE | SIGN |

| AUTHORIZED BY: | | | | |
|---|---|---|---|---|
| | NAME | TITLE | DATE | SIGN |

| AUTHORIZED BY: | | | | |
|---|---|---|---|---|
| | NAME | TITLE | DATE | SIGN |

[Form #PO1; 6/8/01]